Edith E. SPENCER, Plaintiff,

v.

BOARD OF POLICE COMMISSIONERS, et al., Defendants.

No. 82–0854–CV–W–1.

United States District Court, W.D. Missouri, W.D.

May 16, 1983.

On Summary Judgment June 3, 1983.

---

Richard H. Anton, Kansas City, Mo., for plaintiff.

Manfred Maier, Neal E. Millert, James, Millert, Houdek, Tyrl & Sommers, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDERS

JOHN W. OLIVER, Senior District Judge.

### I.

This case pends on defendants' motion to dismiss. Defendants allege, pursuant to Rule 12(b)(6), F.R.Civ.P., that plaintiff's complaint fails to state a claim upon which relief can be granted. This Court's April 1, 1983 order reflects that the above case was removed from the April 18, 1983 joint civil trial docket for the reason that the question now presented by defendants' motion to dismiss surfaced at the March 31, 1983 pretrial conference held in anticipation of the trial of this case on the April 18, 1983 trial docket.

The parties have filed their respective suggestions in support of and in opposition to defendants' pending motion to dismiss. As will be apparent from what we shall state in this memorandum opinion, we are satisfied that matters outside the pleadings should be considered and that, therefore, the pending motion to dismiss should be treated as one for summary judgment and disposed of as provided in Rule 56, F.R. Civ.P. Rule 12(b), F.R.Civ.P., of course, provides that under such circumstances "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." An order will be entered affording all parties such a reasonable opportunity to present any material in addition to that which we discuss in this memorandum opinion.

### II.

Plaintiff's complaint is in two counts. Count I attempts to invoke the jurisdiction conferred on this Court by 28 U.S.C. § 1343 and attempts to allege an action under 42 U.S.C. § 1983. Plaintiff alleges a sequence of events which is apparently undisputed. While plaintiff generally alleges that she was deprived of "rights, privileges and immunities secured to Plaintiff by the Federal Civil Rights Act (42 U.S.C. § 1983, et seq.)," her complaint shows that she relies primarily on the Fourteenth Amendment.[1] Plaintiff alleged in that regard the following:

20. That Defendants used the incident on June 4, 1982, and the subsequent investigation in order to transfer Plaintiff to the "Dog Watch" in direct violation of her constitutional rights guaranteed to her by the Fourteenth Amendment to the United States Constitution.

21. That as a direct and proximate result of the foregoing, plaintiff has been deprived of the opportunity to clear a stigma of misconduct from her name and work record; that she has sustained embarrassment, humiliation and mental anguish; that the continuation of the order of suspension and reprimand in her personnel record constitutes grave damage to her career; to her opportunities to advancement, and for increases in income; and that she has sustained actual damages in the amount of Seventy-Five Thousand ($75,000.00) Dollars.

In paragraph 22 of her complaint, the plaintiff alleged that she was entitled to

---

1. We have not overlooked paragraph 16 of plaintiff's complaint which included a vague allegation that "plaintiff was also deprived of her Fourth Amendment right to privacy. . . ." *Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976) establishes that no specific "right of privacy" is established by the Fourth Amendment or any other specific guarantee of the Constitution. Plaintiff's complaint does not contain any allegations which can be said to create any "zone of privacy" or other area entitled to constitutional protection. We therefore take no further notice of plaintiff's Fourth Amendment "right to privacy" claim.

punitive damages in the amount of $250,-000.00. In her prayer for relief, she also prays for injunctive relief in the form of an order which would require the defendants to remove all detrimental material from her personnel file, for an order transferring her back to her former position from which she was transferred, and for her attorney's fees.

Count II of plaintiff's complaint seeks to invoke this Court's pendent jurisdiction over what may be assumed is a State action for defamation.[2] Both defendants' original and amended answers allege that the plaintiff's complaint fails to state a cause of action against either defendant and that this Court lacks subject matter jurisdiction in this cause.

### III.

Plaintiff's pretrial memorandum, filed pursuant to this Court's March 9, 1983 notice of pretrial conference, proposed that defendants stipulate to a number of facts. Plaintiff also attached copies of 17 exhibits which plaintiff indicated she would adduce at trial. Additional exhibits are before the Court, the same having been attached to defendants' answers to plaintiff's interrogatories. Defendants' pretrial memorandum indicates their willingness to accept the following paragraphs of the stipulation as proposed in plaintiff's pretrial memorandum:

1. Plaintiff Edith Spencer is a civilian employee of the Kansas City, Missouri Police Department and has been so employed since February 1, 1969.

2. On June 4, 1982 plaintiff was a clerk-typist assigned to the Metro Patrol Division on Watch 2.

3. The Internal Affairs Division of the Kansas City, Missouri Police Department conducted an investigation of the incident involving plaintiff.

4. Pursuant to the investigation performed by the Internal Affairs Division, plaintiff took a polygraph examination on August 4, 1982.

5. By memorandum dated August 13, 1982, defendant Norman Caron notified plaintiff that she would be suspended for a period of ten (10) days without pay.

6. By notice dated August 17, 1982, plaintiff was transferred from Watch 2 at the Metro Patrol Division to Watch 3 at the East Patrol Division.

7. The letter dated August 13, 1982, notifying plaintiff of her suspension will be a permanent entry in her personnel file with the Kansas City, Missouri Police Department.

8. Plaintiff's Personnel file and station file with the Kansas City, Missouri Police Department are properly identified as business records and no further identification is necessary to establish them as business records. All other objections to the admissibility of any contents of the personnel and station file are preserved.

The exhibits attached to plaintiff's pretrial memorandum and those attached to defendants' answers to plaintiff's interrogatories establish what are apparently the undisputed material factual circumstances of this case.

An Incident Report, prepared by Sergeant Richard James and signed by plaintiff on June 11, 1982, stated that:

At 1300 hours this date, the reporting supervisor was contacted via phone by Officer Robert H. Crum, Raytown, Mo. Police Department relative to Civilian Edith Spencer.

Officer Crum stated that at 1230 hours 6–4–82, Civilian Edith Spencer was apprehended by members of his department at the Mount Olivet Cemetery after they received a complaint from the cemetery

---

**2.** Paragraph 24 of Count II, (which prays for $75,000.00 actual and $150,000.00 punitive damages), makes clear that the "jurisdiction of this Court on this Count II is involked [sic] under the Court's pendent jurisdiction. . . ." We will not discuss the allegations of Count II other than to indicate that should defendants' pending motion be granted, we now indicate that, as a matter of discretion, we will not exercise jurisdiction over Count II in accordance with the teaching of *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and the progeny of that case. *See also* 13 C. Wright & A. Miller, Federal Practice and Procedure, § 3567, at p. 451.

manager that she was stealing flowers from the graves. He went on to relate that Civ. Spencer was to be allowed to return the flowers and he did not believe prosecution would be pursued.

That Incident Report added:

After reviewing the file from the Raytown Police Department, it is apparent that Civ. Edith Spencer is in violation of the Department Rules of Conduct as follows:

1. A member will be held responsible for any act of omission specifically required or prohibited in these and/or other applicable rules or regulations which in any way is prejudicial to good order or discipline, or reflects upon the good name or reputation of the police department, or adversely affects its interests.

2. A member is further charged with the duty to conduct himself at all times in keeping with the Code of Ethics and the policy statements of the Chief of Police; all activity contrary to this concept, whether or not specifically mentioned or prohibited in these rules, may subject a member to disciplinary action.

3. A member shall not engage in any illegal, immoral, or indecent conduct, nor in any normally legitimate act which, when performed in view of the public, would tend to reflect discredit upon the police department.

That report shows that on June 11, 1982 plaintiff's supervisor, Sergeant Edward Wolters, recommended that an "Internal Affairs Investigation" be conducted. In the space provided on the form for the "recommendation of unit or shift commander," Captain Marylyn Brauninger stated the following on June 11, 1982: "Due to conflicting accounts of this incident, I recommend an Internal Affairs Investigation. Ms. Spencer denies stealing anything from

the cemetery and expressed willingness to take a polygraph examination."

Captain Brauninger's comment concerning "the conflicting accounts of this incident" were made in light of the statements contained in Incident Report of Officer Crum of the Raytown Police Department (a copy of which is before the Court) and the statements made by plaintiff in her June 11, 1982 interdepartment communication to Sergeant Wolters (a copy of which is also before the Court), both of which were obviously considered by Captain Brauninger.[3]

Major Elmer Meyer filled in the space provided in the Incident Report for "Recommendation of Division Commander" with the statement: "I concur, request internal affairs investigation." The Bureau Commander James S. Keiter recommended the same thing. In the space provided for "Action taken by Chief of Police," Chief of Police Caron noted that he agreed with the various recommendations and that an Internal Affairs Investigation should be conducted.

Plaintiff's Exhibit No. 2 is a copy of Policy Number 415 of the Kansas City, Missouri Police Department which establishes the procedures for an Internal Affairs Investigation. That exhibit, which was incorporated by reference in paragraph 16 of plaintiff's complaint, stated in part that:

The Internal Affairs Division is responsible for conducting investigations into incidents involving alleged misconduct by department members, complaint investigations that have originated from the filing of O.C.C. complaints, miscellaneous investigations at the request of the Chief of Police or his designee, and the discharge of firearms by department members. The department has established certain guidelines that not only provide for consistency in investigations, but assure department members of their right

---

**3.** The Raytown Police Department report stated that plaintiff had taken "7 assorted pots with assorted flowers" that did not belong to her and that those flower pots had been recovered from the trunk of plaintiff's automobile. Plaintiff's June 11, 1982 interdepartment memorandum to Sergeant Wolters, on the other

hand, stated that "I did not take any flowers or anything else from any graves other than my brother's grave;" that "I know nothing of the seven pots of assorted flowers mentioned in the Raytown Police Department Report;" and that "the Officer did not remove any thing from the trunk of my car."

to fair and equitable treatment during internal investigations....

A department member under investigation shall be informed of the name and rank of the interviewing officer and all other persons present during the interview. The member being interviewed shall be informed of the nature of the investigation prior to the interview, and informed of the names of all complainants, unless there is some compelling reason to the contrary....

The line of questioning by investigators shall be pertinent to the issue of the investigation, and shall be within the area of knowledge thought to be possessed by the member. No devious techniques or accusatory statements shall be employed....

All members of the department, as a condition of employment, sign an employment agreement regarding polygraph examinations. These examinations shall be given to any member at the direction of the Chief of Police or his designee in an effort to clarify any department matter concerning a department investigation....

The member shall be responsible to:

A. Contact the director of the Office of Citizen Complaints, if desired, to request permission to review the O.C.C. files related to the complaint to which he is subject.

B. Answer all questions which are pertinent to the investigation, and furnish a signed statement.[4] Refusal to do so, upon being ordered by a superior, shall result in suspension proceedings being initiated pending further review and action by the Chief of Police.

C. Submit to a polygraph examination at the direction of the Chief of Police or his designee. Refusal to do so, upon being ordered by a superior, shall result in suspension proceedings being initiated pending further review and action by the Chief of Police.

D. Change any statement, if he so desires, by giving an investigator a supplemental statement, with the original signed statement being retained in the case file.

Other exhibits before the Court establish that on June 29, 1982 Internal Affairs Investigator Gene Gillogly took statements from Joseph Harris, the manager of Mount Olivet Cemetery and from Raytown Police Officer Crum. Mr. Harris stated that he "observed the Spencers for roughly a half hour in my personal vehicle before identifying myself;" that he saw the plaintiff remove flowers from graves other than her brother's grave; and that plaintiff, at the request of the Raytown police officer, brought "all the flowers into this office for further identification." Raytown Police Officer Crum's June 29, 1982 statement included the following questions and answers:

Q. Did you, at any time, ask Ms. Spencer why she was removing the flowers and the pots from the graves?

A. Yes. She stated that sooner or later the cemetery would be throwing them away, and she felt there was absolutely no harm in taking the flowers of other peoples graves.

Q. Did Ms. Spencer indicate to you that the flowers that she had removed were on the grave of a member of her family?

A. She indicated to me that she had removed some flowers from her brother's grave, and that she also had removed some from some other people's graves, who she absolutely

---

4. Plaintiff's June 11, 1982 interdepartment communication discussed above was obviously made in accordance with the above provision of Policy Number 415. Plaintiff does not allege that defendant Board of Police Commissioners could not constitutionally promulgate Policy Number 415 or that any of plaintiff's federally protected constitutional rights were somehow violated by Policy Number 415's requirement that an employee furnish such a statement or by its requirement that an employee submit to a polygraph examination, if directed by the Chief of Police or his designee, in accordance with the condition to do so, as contained in an employee's employment agreement.

had no idea who they were, or who they belonged to.

Q. Did you have occasion to observe any of the flowers that she reportedly had removed from these graves?

A. Yes. I asked Ms. Spencer if she had the flowers in the trunk of her vehicle. She stated that she did, at which time I asked her if she would open the trunk, and she did and that is when I observed the flowers that she had taken off of her brother's grave, and also flowers that she had taken off of other individuals graves.

Police Officer Crum further stated that plaintiff identified the flowers that she had taken from her brother's grave and that those flowers "were left in the trunk [for the reason] she stated those flowers did belong to her brother's grave, and I had no reason to doubt her." The question and answer statement of Police Officer Crum continued as follows:

Q. What was done with the remainder of the flowers found in Ms. Spencer's trunk?

A. There were seven assorted pots with assorted different types of flowers in the trunk that she claimed did not belong to her or any member of her family. Those were the ones that were in question. After finding them and seeing them there, I had Ms. Spencer take them out of the trunk of her vehicle, carry them to the office, at which time they were placed in the vestibule of the office area of Mount Olivet. . . .

Q. Did you provide Sergeant James with a copy of the reports taken regarding this?

A. Yes, I did.

Q. Did Ms. Spencer, at any time, tell you that she had not taken any flowers off of any other graves, other than her brother's?

A. No.[5]

On July 9, 1982, Internal Affairs Investigation Officer Gene Gillogly took another statement from the plaintiff. That question and answer statement included the following questions and answers:

Q. Had you removed any flowers from any of the graves in the cemetery?

A. Just my brother's.

Q. Had you removed any other flowers from any of the other graves in the area?

A. No. . . .

Q. Did you have any flowers in your vehicle?

A. Just what I had taken off of my brother's grave in the trunk. . . .

Q. Was there anything in the trunk of your vehicle?

A. Yes.

Q. What was in the trunk of your vehicle?

A. The flowers from my brother's grave.

Q. Were there any other flowers besides the flowers from your brother's grave in the trunk of your vehicle?

A. No.

Q. Was anything removed from your vehicle?

A. No, because he asked me and I told him those belonged to my brother, which I said I had put out there the Sunday before Memorial Day.

5. In response to the usual general question asked at the close of a statement: "Is there anything further you would like to add to this statement?" Officer Crum said:

A. The only thing I would like to add is that I felt like Ms. Spencer was given a break on this incident, due to the fact that she was not arrested for petty larceny, and the only reason I did not arrest her for petty larceny is the fact that she was a civilian employee of the Kansas City Missouri Police Department,

and after contacting Sergeant James, I felt that the matter could be handled internally, rather than externally, through the Kansas City Missouri Police Department. That is one of the main reasons why I obtained a prosecution waiver from Mr. Harris at the time, so he could not come back at a later date and prosecute her for this incident. I informed him it would be handled internally through the Kansas City Missouri Police Department.

Q. Did you have 7 assorted pots and assorted flowers in the trunk of your vehicle?

A. No.

Q. Did you remove any flowers from the trunk of your vehicle and place them in the office of the cemetery?

A. No.

On August 2, 1982, Chief of Police Caron wrote plaintiff a letter which stated:

The Internal Affairs Division is conducting a miscellaneous investigation and it has been determined that it is necessary for you to submit to a polygraph examination.

You are hereby directed to report to Room 600, 1125 Locust on Wednesday, August 4, 1982, at 0830 hours for the above examination.

The August 5, 1982 report of Polygraphist Ray E. Crawford to Captain William Trimble, Commanding Internal Affairs Division, stated the following in its entirety:

Sir:

At the request of the Internal Affairs Division a polygraph examination was scheduled for Edith Evonn Spencer in regard to the Miscellaneous Investigation IAD # 82–297–12.

At 0901 hours on 8–4–82, the above person reported for said examination.

It is the opinion of the Polygraphist that deception was indicated in this person's polygraph records when the following questions were asked of, and answered by, the subject as indicated:

1. June 4, did you tell Raytown Officer Crum that you took flowers off of several family's graves? Answer, No.

2. June 4, at Mount Olivet Cemetery did you take flowers from several other family's graves? Answer, No.

3. June 1 [sic], did you remove several potted plants from your trunk carrying them to the cemetery office? Answer, No.

4. June 4, did you tell Mr. Harris that you had taken flowers off of other people's graves? Answer, No.

When the reporting Polygraphist informed Edith Spencer that her polygraph records indicated that she was not being truthful she admitted that yes she had taken flowers from several other graves in the cemetery while she was there, as well as taking some things off of her relative's graves.

Inv. Don Birdwell, IAD, was contacted and responded to the Polygraph Unit to make a proper disposition.

Investigator Donald Birdwell thereafter took a supplemental statement from plaintiff on August 4, 1982, in apparent accordance with paragraph D of Policy Number 415. Plaintiff's August 4, 1982 supplemental statement contained the following questions and answers:

Q. This statement is regarding a miscellaneous investigation of thefts at Mt. Olivet Cemetery at 76th and Blue Ridge. It is my understanding from Polygraphist Ray Crawford that you now wish to make a supplemental statement regarding this investigation. Is that correct?

A. Yes.

Q. What is it that you would like to add?

A. The question was, "Have you removed any other flowers from any other graves in the cemetery." The answer was "Yes," my brothers and two others.

Q. Had you removed any other flowers from any of the other graves in the area?

A. Yes.

Q. How many graves other than your brother's did you remove flowers from?

A. Two.

Q. Did any of those flowers belong to you?

A. No.

Q. Did you receive permission from the management at Mt. Olivet Cemetery to remove any of the flowers?

A. No.

Q. What did you do with the flowers?

A. I put them in my car.

Q. Will you relate what happened to the flowers after you placed them in your car?

A. They were returned to the caretaker.

Q. Did you voluntarily return the flowers?

A. Yes.

Q. Did you have 7 assorted pots and assorted flowers in the trunk of your vehicle?

A. No, just two and what belonged to my brother.

Q. Who removed the flowers from the trunk of your vehicle and placed them in the office of the cemetery?

A. I did.

Q. Is there anything else you wish to add to this statement?

A. No.

Q. Will you read and sign this statement?

A. Yes.

On August 10, 1982, Sergeant Wolters wrote a supplemental report on an Incident Report form in which he stated:

At 0800 hours on 8/10/82 I received the results of the Internal Affairs Investigation pertaining to Civilian Edith Spencer, IAD File # 82–297–12.

This investigation confirms that Civilian Edith Spencer was in fact in violation of Department rules of conduct # 1, # 2, and # 14 in that she did steal flowers not belonging to her from other grave sites within the Mount Olivet Cemetery, 7601 Blue Ridge, Raytown, Missouri on 6/4/82 and that when apprehended identified herself as a civilian employee of the Kansas City, Missouri Police Department.

In addition, on 6/11/82 in her written answer to Sergeant James' Department Incident Report concerning the alleged violation and again on July 9, 1982 in her official statement concerning the alleged violation to Investigator Gene Gillogly of the Internal Affairs Division, she denied removing flowers from any grave site other than her families. On 8/4/82 a polygraph examination was conducted by polygraphist Ray E. Crawford which indicated deception in both her answers pertaining to the actual theft and her previous statements given. When polygraphist Crawford informed Civilian Spencer that the polygraph records indicated she was being untruthful, she admitted that she had taken flowers from several other graves as well as from her relative's graves.

She then made a supplemental statement to Investigator Don Birdwell of Internal Affairs Division, which she subsequently signed, admitting that she removed flowers from two other graves that did not belong to her, put them in the trunk of her car, and when caught by the caretaker she voluntarily returned the flowers.

Plaintiff acknowledged receipt of a copy of that report on August 11, 1982. Sergeant Wolters, as plaintiff's supervisor, recommended that plaintiff be terminated. Captain Brauninger, as plaintiff's unit commander, also recommended termination. Plaintiff's Division commander recommended: "termination or resign." The Bureau Commander, however, recommended that plaintiff be given "15 days suspension." Chief of Police Caron considered all recommendations and concluded that plaintiff should be suspended "5 days for theft & 5 days for lying."

On August 13, 1982, Chief of Police Caron wrote plaintiff the following letter:

I have reviewed all reports and statements taken during an Internal Affairs Division investigation concerning your actions and conduct on June 4, 1982, at 76th and Blue Ridge.

It has been determined that on this date you removed flowers not belonging to you from grave sites within the Mount Olivet Cemetery. When questioned by an Internal Affairs investigator regarding this allegation, you denied removing the flowers until confronted with the results of a polygraph examination administered to you. Your actions on this date are in direct violation of Rules of Conduct 1, 2 and 14. I therefore am assessing you

ten (10) days suspension, five for the theft of the flowers, and five for your untruthfulness when questioned by Internal Affairs investigators regarding this incident.

Effective August 15, 1982 through August 28, 1982, inclusive, you are hereby suspended from duty on the Kansas City Missouri Police Department. You will forfeit all relevant pay and allowances which shall consist of ten (10) salaried duty days (80 hours).

I suggest you thoroughly review the Rules of Conduct contained in your Personnel Policy and Benefit Manual and ensure that violations of this nature do not occur in the future.

A copy of this letter will be placed in your official personnel file.

Plaintiff was transferred from Watch 2 to Watch 3 on August 17, 1982. She is presently employed by the Kansas City Missouri Police Department.

Plaintiff's opposition to defendants' pending motion is based on the notion that Section 1983 grants plaintiff a right to have a jury determine whether plaintiff's testimony at trial concerning the incident is true or false. As our discussion of the applicable law will disclose, the question of whether plaintiff did or did not steal the flowers is not a *material* fact which precludes the determination of this case on a motion for summary judgment. As will be apparent, it is our view that the existence of genuine issues of fact concerning the circumstances that relate to whether flowers were stolen from the graves of other persons are not factual disputes that are material to the determination of a motion for summary judgment.

### IV.

The Due Process Clause of the Fourteenth Amendment provides that "[N]or shall any State deprive any person of life, liberty, or property, without due process of law ...." Defendants' suggestions in support of their pending motion contend that plaintiff's complaint has alleged no facts, conclusory or otherwise, which, if true, could be said to establish deprivation of plaintiff's "property" or any claim of entitlement that plaintiff could have to continued or uninterrupted employment under applicable State law. In regard to plaintiff's "liberty" claim, defendants argue that none of the Supreme Court's decisions are broad enough to support that basis for plaintiff's claim.

Plaintiff's suggestions in opposition to defendants' motion concede that plaintiff "is not a uniformed police officer and therefore does not have the complete protection of the Missouri statutes." Plaintiff, however, argues that "she still has a substantial liberty and property interest in her employment, at least to the very nature of her receiving pay and benefits for her employment." Plaintiff contends that under applicable State law she is able "to show a reasonable expectancy of continued employment" within the standard stated in *Perry v. Sindermann,* 408 U.S. 593 [86 S.Ct. 1130, 16 L.Ed.2d 218] (1972). Plaintiff also argues that she "stated a cause of action in accordance with the holding in *Wisconsin v. Constantineau,* 400 U.S. 433 [91 S.Ct. 507, 27 L.Ed.2d 515] (1971)," in that she has presented a claim of damage to her name and reputation with obvious subsequent injury to her continued employment."

It is not necessary that we discuss either *Perry v. Sindermann* or *Wisconsin v. Constantineau* in any detail for the reason that both those cases are cited and relied upon by the Supreme Court's later decision in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). It is necessary that we discuss *Bishop v. Wood* in some detail for the reason that that case involved the termination of a policeman's employment without affording him any hearing to determine the sufficiency of his discharge. While there is obviously a factual difference between a police officer's suspension and a police officer's discharge, *Shawgo v. Spradlin,* 701 F.2d 470 (5th Cir.1983) establishes that the principles stated in the discharge cases are equally applicable to a case which, on its facts, involves only a suspension.

In *Bishop v. Wood,* the district court granted defendants' motion for summary judgment. The Fourth Circuit affirmed. The Supreme Court, which likewise affirmed, stated at the outset that:

> The questions for us to decide are (1) whether petitioner's employment status was a property interest protected by the Due Process Clause of the Fourteenth Amendment, and (2) *assuming that the explanation for his discharge was false,* whether that false explanation deprived him of an interest in liberty protected by that Clause. [426 U.S. at 343, 96 S.Ct. at 2077] (Emphasis ours)

In reliance upon *Perry v. Sindermann, supra,* and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Court stated that "A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement *must be decided by reference to state law.*" *Id.* 426 U.S. at 344, 96 S.Ct. at 2077 (emphasis ours). The Court noted that the district court had concluded that as a matter of North Carolina law, a policeman "held his position at the will and pleasure of the city." In light of the affirmance of the district court's determination of the State law question by the Court of Appeals, the Supreme Court accepted the district court's interpretation of North Carolina law.

In regard to whether the plaintiff could be said to have had any "property" interest protected by the Fourteenth Amendment, the Court stated that "in this case, as the District Court construed the ordinance, the City Manager's determination of the adequacy of the grounds for discharge is not subject to judicial review; the employee is merely given certain procedural rights which the District Court found not to have been violated in this case." The Court concluded that "under that view of the law, petitioner's discharge did not deprive him of a property interest protected by the Fourteenth Amendment." [*Id.* at 347, 96 S.Ct. at 2079]

In regard to whether the plaintiff could be said to have had any "liberty" interest entitled to Fourteenth Amendment protection, the Court stated that:

> Petitioner's claim that he has been deprived of liberty has two components. He contends that the reasons given for his discharge are so serious as to constitute a stigma that may severely damage his reputation in the community; in addition, he claims that those reasons were false. [*Id.*]

Because the district court granted summary judgment against the plaintiff, the Court was required to "assume that his discharge was a mistake and based upon incorrect information." Nevertheless, the Court stated the following in connection with plaintiff's "liberty" claim:

> In *Board of Regents v. Roth,* 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548], we recognized that the nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would stretch the concept too far "to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.,* at 575 [92 S.Ct. at 2708]. This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer *when there is no public disclosure of the reasons for the discharge.* [*Id.* at 348, 96 S.Ct. at 2079] (emphasis ours)

The Court noted that "on the facts, the plaintiff policeman had been advised of the reasons for his termination in private and that those reasons had not been publicly stated until the defendants responded to an interrogatory which defendants filed after the plaintiff had filed his Sec. 1983 action." The Court therefore concluded that:

> Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor, or integrity" was thereby impaired. And since the latter communica-

tion was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim.

*Bishop v. Wood* was most recently followed in *Connick v. Myers,* —— U.S. ——, ——, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). In that case the Supreme Court, reversing the Fifth Circuit's affirmance of a judgment in favor of the plaintiff in a governmental employee Section 1983 case, held that:

> Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service *which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.* Board of Regents v. Roth, 408 U.S. 564 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972); *Perry v. Sindermann,* 408 U.S. 593 [92 S.Ct. 2694, 33 L.Ed.2d 570] (1972); *Bishop v. Wood,* 426 U.S. 341, 349–50 [96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684] (1976). [—— U.S. at ——, 103 S.Ct. at 1690] (Emphasis ours)

The cases above cited make clear that the question of whether plaintiff in this case had any property interest in her employment as a civilian employee of the Kansas City Police Department and the sufficiency of plaintiff's claim of entitlement to continued or uninterrupted employment must be decided by reference to the law of Missouri. The Missouri General Assembly has long provided that the Police Department of Kansas City, Missouri be organized under provisions which are applicable solely to Kansas City. *See* §§ 84.350–84.890 V.A. M.S. The Board of Police Commissioners is authorized by § 84.480 to appoint a chief of police. Section 84.510(1) generally authorizes the chief of police, with the approval of the board, to appoint "police department employees, including policemen, policewomen, and civilian employees." The power of the chief of police to appoint employees is further authorized by § 84.520 which makes clear that the compensation of civilian employees shall not exceed that paid police officers but that "the chief of police, with the approval of the board, may establish lower compensation for civilian employees than that received by police officers."

As plaintiff concedes, persons appointed as civilian employees have no tenure and are not within the scope of § 84.600 which provides that police officers, unlike civilian employees, after satisfactory service of a probationary term of six months, "shall thereafter be subject to discharge or removal only for cause and upon complaint being made or charges being preferred against them." Section 84.600 provides for a full adversary public hearing before the board.

Section 84.610 grants all employees of the Kansas City Police Department the right to have a particular disciplinary action taken by the chief of police reviewed by the board of police commissioners and also requires the board to grant a public hearing after a written request for review has been made. That section provides in its entirety as follows:

> Any police officer, policeman or employee adversely affected by any action taken by the chief which he is required to report to the board under the provisions of subdivision (1) of section 84.500 shall have the right to have such action of the chief of police reviewed by the police board upon filing with the secretary of the board within ten days after the effective date of such action a written request for review by said police board. Whereupon the police board shall grant a public hearing within fifteen days after the filing of such request. The board shall have the power to inquire into all the facts and circumstances pertaining to such action and may compel the attendance of witnesses by subpoena at the request of either the police officer, policeman or employee involved, the chief of police or any member of the board. The board shall have the power upon such hearing to affirm, modify or reverse such action of the chief and may make such other orders as the board may deem nec-

essary. The board shall report all decisions in writing to the chief of police and to the officer or employee involved. Each decision of the police board in such cases shall be final and not subject to review by any court.

It is quite doubtful that plaintiff would have had the right to have her ten day suspension reviewed by the police board for the reason that § 84.500(1), which grants power to the chief of police to "discipline, suspend or discharge [all] employees of the police department other than police officers," also provides that "A report of all such actions taken (*other than suspensions of less than fifteen days*) shall be submitted to the board at its next meeting." (Emphasis ours).

We recognize that plaintiff conceded in her deposition that she did not exercise some sort of right that she may have had "under the grievance procedure" to speak to the chief of police in regard to the Internal Affairs investigation. *See* pp. 14–15 of plaintiff's deposition. The fact, however, that plaintiff may have had some sort of right under a grievance procedure, or that she may have had a right to a public hearing before the board for the reason that the chief of police may have reported her ten day suspension (even though he was not required by statute to have done so), are not facts material to any issue in this case. Such facts could be considered material only in regard to some claim that plaintiff may not have exhausted available administrative remedies before attempting to maintain this § 1983 action. The notion that any plaintiff under § 1983 is required to exhaust available State administrative remedies was again rejected by the Supreme Court in *Patsy v. Bd. of Regents of State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1983).

More important, the fact that plaintiff may have had a right to a public hearing to review the disciplinary action taken by the chief of police can not, under applicable Missouri law, be said to create any property interest in her employment as a civilian employee of the Kansas City Police Depart-

ment. Nor, under Missouri law, can plaintiff's status as a civilian employee be said to support any claim of entitlement protected by the Due Process Clause of the Fourteenth Amendment. The laws of Missouri applicable to the Kansas City, Missouri Police Department simply do not provide that civilian employees of that department shall have any tenure whatsoever.

Such civilian employees are precisely in the same legal position as the chief of police himself, who, under § 84.490, expressly serves "during the pleasure of the board." While regularly appointed "police officers," after satisfactory service of a six month probationary period, are "subject to discharge or removal only for cause" under § 84.600, it is clear that neither the chief of police nor civilian employees are within the coverage of that statute. It also is to be noted that § 84.500 grants power to the chief of police only "to promote, discipline and suspend all police officers," in contrast to the power granted the chief of police by that section "to promote, discipline, suspend *or discharge*" such employees of the police department other than police officers.

*Van Kirk v. Board of Police Com'rs, etc.,* 586 S.W.2d 350 (Mo. en banc 1979) makes clear that absent a contractual right or a right created by statute, a police officer, including the chief of police, must be considered as an employee at will and subject to the long established general Missouri rule of decision that an employee at will, whether private or governmental, is subject to discharge for any reason or for no reason at all.

Chief of Police Van Kirk of the Kansas City Missouri Police Department was summarily removed from office a little over one year after he was appointed. Van Kirk requested a written statement of the reasons for his removal and a public hearing under the provisions of § 84.490. That section, of course, is quite comparable to the type of public hearing that may be requested by police officers or civilian employees of the Kansas City Missouri Police Department who claim they have been adversely affected by a particular disciplinary action

imposed by the chief of police, as provided in 84.610, which we have discussed above.

The Board of Police Commissioners conducted a public hearing and immediately thereafter reconfirmed its prior order of removal. Van Kirk sought to have that action set aside alleging that the "Board failed to furnish him with the true reasons for its decision" and that the Board had failed to produce any evidence at the post-decision hearing which tended to prove any fact relied upon by the Board to support the reasons stated for its action. The State trial court concluded that the plaintiff held his office during the pleasure of the board, that he had established no contractual or statutory right to continue to hold that office, and that he therefore could be removed "for any reason or no reason."

The Supreme Court of Missouri affirmed the State trial court, stating that:

We agree with the circuit court. The language of the statute, "The chief of police shall serve during the pleasure of the board," is susceptible of but one meaning: that any person appointed chief of police of Kansas City serves at the will of the board; that he has no fixed term, nor property right or interest in the office; and that he may be removed by the board with or without cause or reasons whenever, in its discretion, it wishes to do so. The only limitation upon this power is that such removal not be in violation of, or in retribution for the exercise of, a constitutionally protected right. *Christy v. Petrus,* 365 Mo. 1187, 295 S.W.2d 122, 124 (Mo. banc 1956); *Williams v. Jones,* 562 S.W. 391, 395[4, 5] (Mo.App.1978); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578[10], 92 S.Ct. 2701 [2709], 33 L.Ed.2d 548 (1972); *Prince v. Bridges,* 537 F.2d 1269, 1272[7] (4th Cir.1976); *Patterson v. Ramsey,* 413 F.Supp. 523, 531[6, 7] (D.Md. 1976), *aff'd* 552 F.2d 117, 118 (4th Cir. 1977); *Ellis v. State Department of Wel-*

*fare* [365 Mo. 614], 285 S.W.2d 634 (Mo. banc 1955). [586 S.W.2d at 353]

With specific reference to Van Kirk's claim that he had a "property right to continue in the office of chief of police," which had allegedly been taken from him without due process of law as guaranteed by both the Missouri Constitution and the Fourteenth Amendment, the Court held:

Because his service is during the pleasure of the board, he has no constitutionally protected right to the office. *The Board of Regents of State Colleges v. Roth, supra, Christy v. Petrus, supra; Bishop v. Wood,* 426 U.S. 341, 347[4], 96 S.Ct. 2074 [2078], 48 L.Ed.2d 684 (1976). [*Id.*]

And, in regard to the procedure established by § 84.490, which provided for only a post-termination written statement of the reasons for the removal and a public hearing thereafter, all subject to the express provision in § 84.490 that "the action of the board in suspending, removing or demoting the chief of police shall be final and not subject to review by any court," the Missouri Supreme Court stated that "the procedures provided by § 84.490 do not offend the state or federal constitutions. *Bishop v. Wood, supra,* (426 U.S. [341] at 345, 346, 347, 96 S.Ct. 2074 [at 2077, 2078, 2079, 48 L.Ed.2d 684])." [6]

*Christy v. Petrus,* 365 Mo. 1187, 295 S.W.2d 122 (Mo.Sup.Ct. en banc 1956) and *Williams v. Jones,* 562 S.W.2d 391 (Mo.App. 1978), both cited and relied upon by the *Van Kirk* court, illustrate that the Missouri rule of decision regarding an employer's right to terminate an employee at will is applicable both to private and governmental employment. *Christy,* which did not involve a government employee, stated the established Missouri rule of decision as follows: "the rule is well established in this state and elsewhere that in the absence of a contract for employment for a definite term or a contrary statutory provision, an employer may discharge an employee at any

---

**6.** It is, of course, to be noted that the similar public hearing review procedure set forth in § 84.610 contains a similar provision that "each decision of the police board in such cases shall be final and not subject to review by any court."

time, without cause or reason, or for any reason and, in such case, no action can be maintained for wrongful discharge."

*Williams v. Jones* makes clear that the rule stated in *Christy* is applicable to persons appointed to a governmental position authorized by a Missouri statute. Plaintiff in that case brought a damage suit alleging that he had been unlawfully and wrongfully discharged from his position of employment with the Juvenile Division of the Circuit Court of the City of St. Louis. The trial court granted defendants' motion to dismiss for failure to state a claim. The Missouri Court of Appeals posed the question: "Does the fact that he was employed by the juvenile court give appellant rights he would not have in a private employment situation?" [562 S.W.2d at 395]

The Missouri Court of Appeals examined the sections of the statute which granted power to the Juvenile Court to appoint personnel authorized to serve that court. It determined that "nothing in either of these sections provides for a definite term of employment, and we have not been referred by appellant to any other statutory provision which establishes either a definite term or a prescribed method of termination." It thereafter concluded that "therefore, appellant's employment was at the will of the juvenile court and he was subject to removal at any time by the judge, with or without cause." [*Id.* at 396] The *Williams* court explained the basis for its holding as follows:

> In Missouri, the rule regarding the essential elements of an action based upon wrongful discharge from employment is clear. A contract of employment and a breach thereof are prerequisites to a

cause of action for wrongful discharge. (citing Missouri cases) An indefinite hiring is a hiring at will which may be terminated by either party at any time, and no action can be sustained for wrongful discharge. (citing Missouri cases)

In the absence of a contract, termination of appellant's employment was at the will of the employer, here the juvenile court. Just as appellant could have left his employment at any time with or without cause, so also could he be discharged at any time with or without cause. [*Id.* at 395]

Plaintiff in the *Williams* case, as did plaintiff in this case, apparently made some sort of a "stigma" claim in connection with termination of plaintiff's employment. The court concluded first that the allegations in that regard were "mere legal conclusions and not the averments of fact which are required," but added that:

> Further, there must be a public disclosure of the reasons for dismissal before there can be damage to the community reputation of the discharged employee. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1975). No facts are alleged in the petition to support such charges or public disclosure. [*Id.* at 397]

*Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), a case discussed at pretrial conference, does not support plaintiff's § 1983 action. Indeed, the Supreme Court noted, but did not disturb, the Court of Appeals' affirmance of the district court's conclusion that "under Missouri law petitioner possessed no property interest in continued employment as Police Chief." *Id.* at 631, 100 S.Ct. at 1405.[7]

---

7. The district court in *Owen* found that under the Charter of the City of Independence "plaintiff knowingly served as Chief of Police at the will of the City Manager and was subject to discharge without notice of reasons and a hearing at any time the City Manager determined that his discharge was 'for the good of the service.'" 421 F.Supp. [1110] at 1120. The district court "therefore concluded that plaintiff had no property interest in his employment as Chief of Police which would entitle him to procedural and substantive due process rights." *Id.* at 1120–21.

The Court of Appeals, in part III of its first opinion published in 560 F.2d [925] at 937–38 (8th Cir.1977), stated the reasons why it affirmed the district court on that branch of the case and why *Bishop v. Wood* required that it "reject Owen's contention that he possessed a property interest in continued employment as Chief of Police of the City of Independence." In its second opinion, reported in 589 F.2d 335, 337 (8th Cir.1979), the Court of Appeals again noted that it had "rejected Owen's contention relating to an alleged property interest."

The Supreme Court affirmed the Court of Appeals' conclusion that "the city's alleged false public accusations had blackened petitioner's name and reputation, thus depriving him of liberty without due process of law." *Id.* at 631, 100 S.Ct. at 1405. Plaintiff in this case does not allege that defendants made any public accusation against her. In this case, as in *Bishop v. Wood,* it is apparently undisputed that there was no public disclosure of the fact plaintiff had been subjected to an internal investigation which led to her ten day suspension, until she attempted to bring a Section 1983 action. The Supreme Court was primarily concerned in *Owen v. City of Independence* with the question of whether a municipality could assert a good faith defense in a Section 1983 action; that case did not suggest that the principles stated in *Bishop v. Wood* were not to be applied to the factual circumstances of later cases involving the discharge or discipline of governmental employees.[8] We conclude this memorandum opinion by quoting the final paragraph of the Court's opinion in the controlling case of *Bishop v. Wood:*

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

It is apparent from what we have stated that it is our tentative view that defendants' motion to dismiss, if treated as a motion for summary judgment under Rule 12(b), should be granted unless plaintiff is able to demonstrate why a motion for summary judgment directed to Count I should not be granted. As noted at the outset, defendants' motion to dismiss was expressly filed pursuant to Rule 12(b)(6). The last sentence of Rule 12(b) provides the following:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In accordance with the mandate of that portion of the Rule, we shall enter an order which will afford all parties a reasonable opportunity to present all materials made pertinent to a Rule 56 motion for summary judgment and to require that plaintiff show cause as to why a motion for summary judgment directed to Count I should not be granted in defendants' favor under the undisputed circumstances of this case.

For the reasons stated, it is

ORDERED (1) that on or before May 26, 1983, all parties shall present any additional material which they may wish to have before the Court and which they believe to be pertinent to ruling a Rule 56 motion for summary judgment directed to Count I of

---

The Supreme Court did not disturb the conclusion of the district court and that of the Court of Appeals in regard to the question of State law presented.

**8.** We should perhaps add a word concerning *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), also discussed at the pretrial conference in this case. If plaintiff's complaint could be read as an effort to hold defendant Board of Police Commissioners liable on a *respondeat superior* theory, *Monell* establishes that such a theory is not available to plaintiff in a Section 1983 action. *See also* the more recent case of *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981).

plaintiff's complaint. If a party does not wish to have any additional material presented before the Court, such party shall file a response to this order which shall so state. It is further

ORDERED (2) that on or before that same day, plaintiff shall show cause in writing why, for any reason, an order should not be entered which would grant a motion for summary judgment in favor of the defendants in regard to Count I of plaintiff's complaint. It is further

ORDERED (3) that either party may file a response to any filing made by the opposing party pursuant to the above Orders of this Court within five (5) days after such filing will have been made.

## ON SUMMARY JUDGMENT

### I.

On May 16, 1983, for reasons fully stated in our memorandum opinion filed that day, we concluded that defendants' Rule 12(b)(6) motion to dismiss Count I of plaintiff's complaint should be treated as a motion for summary judgment and disposed of as provided in Rule 56. In accordance with Rule 12(b) we entered an order which afforded all parties a reasonable opportunity to present all materials pertinent to a Rule 56 motion for summary judgment.

A second order entered May 16, 1983 provided that "plaintiff shall show cause in writing why, for any reason, an order should not be entered which would grant a motion for summary judgment in favor of the defendants in regard to Count I of plaintiff's complaint." Defendants filed a response to our May 16, 1983 order which stated that defendants did not wish to present any additional material for the Court's consideration.

Although afforded the reasonable opportunity mandated by Rule 12(b) to present all additional material pertinent to a Rule 56 motion for summary judgment, plaintiff's response did not present any additional factual data, either by way of affidavit or otherwise, in response to this Court's May 16, 1983 order. Rather, on May 26, 1983, plaintiff filed a short response which stated that plaintiff "submits to this Court that if the Court is inclined to rule in favor of the Defendants, the Court should do so by dismissing Plaintiff's complaint for lack of jurisdiction, rather than by granting summary judgment in favor of the Defendants." Plaintiff's response also stated, in the alternative, that "the Court, if it grants the Defendants a summary judgment, should do so only with respect to Count I and should then dismiss Count II without prejudice."

Defendants have advised the Court that they do not wish to file any reply to plaintiff's response. The case is thus in appropriate posture for final ruling. For the reasons stated below, we find and conclude that plaintiff has not shown any cause as to why summary judgment should not be granted in defendants' favor in regard to Count I of plaintiff's complaint.

### II.

The opening paragraph of plaintiff's short response clearly reflects that plaintiff understood, after reading our May 16, 1983 memorandum opinion, that the Court, as contemplated by Rule 12(b), had considered "matters outside the pleading [which had been] presented to and not excluded by the court" in connection with defendants' Rule 12(b)(6) motion to dismiss and that the Court was "obviously intending to dispose of this matter as a Motion for Summary Judgment," as provided in Rule 56.

We recognize that plaintiff's response stated plaintiff's position that under the present procedural posture of this case "the appropriate measure would be to dismiss Plaintiff's complaint rather than to grant the Defendants summary judgment in their favor." We also recognize that plaintiff's response also stated in highly conclusory language that "the Plaintiff believes that substantial issues of fact exist and enough discrepancies in the various evidence and other matters presented to the Court to justify consideration by a jury."

Plaintiff's response, however, did not even attempt to point out any specific material factual issue which could be said to be in dispute. Nor did plaintiff attempt to point to what might be considered as "discrepancies in the various evidence and other matters presented to the Court." In short, plaintiff has, within the meaning of Rule 56(e), elected to rest on the "mere allegations" of Count I of her complaint. Plaintiff's position is untenable under established summary judgment practice.

Rule 56(e) of the Rules of Civil Procedure provides in its pertinent part that:

> When a motion for summary judgment is made and supported as provided in this rule, *an adverse party may not rest upon the mere allegations or denials of his pleading,* but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. (Emphasis ours).

The quoted portion of subdivision (e) was added to Rule 56 in 1963. Numerous Eighth Circuit cases have since recognized that Rule 56(e) means what it says. *See,* for example, *Lyons v. Board of Ed. of Charleston, Etc.,* 523 F.2d 340, 347 (8 Cir. 1975), which quoted the following from *Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 293 (8 Cir. 1975), *cert. denied* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1975):

> Summary judgment is always warranted where the party resisting the motion does so by relying solely upon his pleadings and submits no evidence to rebut the moving party's conclusive demonstration of absence of a genuine issue of material fact. Fed.R.Civ.P. 56(e) mandates affirmative action by a party opposing such a motion. Failure to take such action justifies a court in entering summary judgment, * * *. (Footnote omitted).

In *Roberts v. Browning,* 610 F.2d 528, 531 (8 Cir.1979), the Eighth Circuit reiterated its frequently stated view that "summary judgment is a harsh remedy and should be granted sparingly." The *Roberts* court appropriately added that "on the other hand, courts should not be unreasonably niggardly in its use [of Rule 56] lest the purpose of the rule, which is to avoid needless trials, be defeated."

The Eighth Circuit's construction of Rule 56(e) is consistent with the construction placed on that rule by all the Circuits. It is appropriately stated in ¶ 56.11[3] of Moore's *Federal Practice* that a party opposing summary judgment "may not hold back his evidence until trial; he must present sufficient materials to show that there is a triable issue." *See* also Section 2727 of Wright & Miller, *Federal Practice and Procedure,* in which it is stated that "the parties on a summary judgment motion must fully disclose what the evidence will be on the alleged issues and [that] a party may not withhold what he intends to use at trial."

Plaintiff's response does not set forth any specific facts which even attempt to show that there is a genuine issue for trial. It is therefore appropriate that an order be entered granting defendants summary judgment in regard to Count I of plaintiff's complaint for the reasons stated in our May 16, 1983 memorandum opinion.

### III.

In footnote 2 of our May 16, 1983 memorandum opinion we stated that "should defendants' pending motion [directed to Count I of plaintiff's complaint] be granted, we now indicate that, as a matter of discretion, we will not exercise jurisdiction over Count II in accordance with the teaching of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and the progeny of that case. *See* also, 13 C. Wright & A. Miller, *Federal Practice and Procedure,* § 3567, at p. 451."

When we wrote footnote 2, we entertained substantial doubt as to whether, should plaintiff later file a new libel action in State court, such an action could, under Missouri law, survive a motion to dismiss. *See Ellis v. Jewish Hospital of St. Louis,*

581 S.W.2d 850 (Mo.App.1979) for a recent Missouri case which states the applicable Missouri law in regard to whether plaintiff will be able to plead and prove the essential element of publication in any libel action that she may seek to maintain in a Missouri court. Missouri Rule 55.27(b) is substantially the same as Federal Rule 12(b) and Missouri Rule 74.04 is substantially the same as Federal Rule 56. A motion to dismiss a State court petition in substantially the same form as Count II in plaintiff's complaint in this Court would apparently be treated in a Missouri trial court in the same manner as this Court treated defendants' motion to dismiss Count I of plaintiff's complaint.

Although we still entertain that same substantial doubt, we are satisfied that our discretion should be exercised in the manner stated in footnote 2. *See Sullivan v. Laborer's International Union North America,* 707 F.2d 347, 351 (8th Cir.1983) and cases cited therein. Accordingly, an order will be entered dismissing Count II of plaintiff's complaint without prejudice.

### IV.

For the reasons stated in our May 16, 1983 memorandum opinion, which we incorporate herein by this reference, and for the reasons above stated, it is

ORDERED (1) that defendants' motion to dismiss Count I of plaintiff's complaint, which has been treated as a Rule 56 motion for summary judgment as provided in Rule 12(b) of the Rules of Civil Procedure, should be and the same is hereby granted. It is further

ORDERED (2) that Count II of plaintiff's complaint, which seeks to invoke only the pendent jurisdiction of this Court, should be and the same is hereby dismissed without prejudice. It is further

ORDERED (3) that the Clerk, pursuant to Rule 58 of the Rules of Civil Procedure, shall prepare and enter as a separate document an appropriate judgment which will reflect the action of the Court under the orders above entered.